UNITED STATES *v.* ORLEANS ET AL.

No. 75–328.   Argued March 22, 1976—Decided June 1, 1976

Burger, C. J., delivered the opinion for a unanimous Court.

*Harry R. Sachse* argued the cause for the United States. With him on the briefs were *Solicitor General Bork, Assistant Attorney General Lee,* and *Leonard Schaitman.*

*William E. Pfau, Jr.,* argued the cause for respondents. With him on the brief were *Charles F. Clarke* and *James P. Murphy.*

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

This case presents the question whether a community action agency funded under the Economic Opportunity Act of 1964 is a federal instrumentality or agency for purposes of Federal Tort Claims Act liability.

I

Title II of the Economic Opportunity Act of 1964, 78 Stat. 516, as amended, 81 Stat. 690, 42 U. S. C. § 2781 *et seq.,* was passed to "stimulate a better focusing of all available local, State, private, and Federal resources upon the goal of enabling low-income families, and low-income individuals . . . to become fully self-sufficient." 42 U. S. C. § 2781 (a). To this end the Act "provides for community action agencies and programs, prescribes the structure and describes the functions of community action agencies and authorizes financial assistance to community action programs and related projects and activities." *Ibid.*

Under the statute a community action agency is a "State or political subdivision of a State . . . or a public or private nonprofit agency or organization which has been designated by a State or such a political subdivision . . ." and which is "capable of planning, conducting, administering and evaluating a community action program . . . ." 42 U. S. C. § 2790 (a). A community action program "includes or is designed to include . . . a range of services and activities having a measurable and potentially major impact on causes of poverty in the community . . . ." *Ibid.*

The Warren-Trumbull Council for Economic Opportunity, Inc., is a community action agency; it is a nonprofit corporation incorporated under § 1702.01 *et seq.* of the Ohio Revised Code. At the time of this suit, the

Warren-Trumbull Council received all of its monetary resources from the Office of Economic Opportunity (OEO), the federal agency established to administer the Economic Opportunity Act.[1] The Council also received local "in-kind" contributions and was empowered to receive funding from other sources. The "in-kind" contributions supply the 20% local support which each community action agency must receive to qualify for federal grants. 42 U. S. C. § 2812 (c).

One of the activities of the Warren-Trumbull Council was the Westlawn Neighborhood Opportunity Center (Westlawn), established under 42 U. S. C. § 2811. Westlawn sponsored a recreational outing for a group of children. The Warren-Trumbull Council furnished a van for the outing. Since the van was not large enough to transport all the children, employees of the Council arranged for two young men from the Westlawn area to drive some of the children to and from the outing in privately owned automobiles. Respondent Joseph V. Orleans was one of the children on the outing who, while returning in one of the private cars, was injured when the car collided with a parked truck.

The injured boy and his father, having exhausted their administrative remedies, sued the United States in the United States District Court for the Northern District of Ohio under the Federal Tort Claims Act, 28 U. S. C. §§ 1346 (b) and 2671 et seq., alleging that agents of the United States in charge of the outing were negligent in its organization and supervision. The United States moved for summary judgment pursuant to Fed. Rule Civ. Proc. 56 on the ground that the Warren-Trumbull Council and Westlawn were not "instrumentalities or

---

[1] The Community Service Administration succeeded the Office of Economic Opportunity. The CSA is the agency which currently furnishes financial assistance to community action agencies. 88 Stat. 2310, 42 U. S. C. § 2941 (1970 ed., Supp. IV).

agencies of the United States within the purview and scope of 28 U. S. C. 2671."

The District Court granted the Government's motion, holding that the Warren-Trumbull Council was a contractor with the OEO, "not a corporation acting as an instrumentality or agency of the United States." The District Court also found that employees of the Warren-Trumbull Council and Westlawn are not federal employees. *Orleans* v. *United States,* No. C72–260–Y (Sept. 13, 1973). In response to respondents' motion to reconsider, the District Court accepted "the four basic facts upon which plaintiffs base their conclusion": that the Warren-Trumbull Council "was created for the purpose of carrying out the community action programs contained in the Economic Opportunity Act of 1964," that the Council received no funds from any source other than the OEO, that the Council conducted only programs "formulated and funded by the federal government," and that the OEO closely supervised the Council and its activities. The District Court also noted that federal funding was stopped until the Warren-Trumbull Council was reorganized and a new chairman of the governing board was appointed. The District Court held, however, that the recited facts did not warrant a conclusion that the Council was an agency or instrumentality of the Federal Government. The District Court determined that Congress intended that community action agencies be locally controlled and that the Warren-Trumbull Council was empowered and encouraged to receive money and develop programs from federal and other sources. The District Court found that whether or not the Council used this power it "remains an independent, locally controlled and constituted non-profit corporation." The District Court, in reaffirming its prior ruling, thus held that the Council was a contractor conducting "prepackaged Federal programs."

The Court of Appeals for the Sixth Circuit reversed the District Court, 509 F. 2d 197 (1975), holding that it was necessary to examine the "type and extent of control retained by the principal." *Id.,* at 201. It noted, however, that it was "necessary to keep in mind the concept of the importance of using all the resources of the local community to fight poverty which underlies the Economic Opportunity Act of 1964." *Id.,* at 202.

> "The relationship between OEO and WTCEO [the Warren-Trumbull Council] meets a number of the criteria for establishing that WTCEO is an independent contractor. There was no showing that OEO controlled or supervised the physical performance of the work of employees of WTCEO and Westlawn. Moreover, the requirements imposed on these local agencies by statute and regulations are not concerned with the details of the day-to-day operations of the agencies or the programs which they carry on in the Warren-Trumbull County area. They are more in the nature of general instructions to be followed in order to assure that certain policies which Congress had adopted in establishing OEO are respected and adhered to." *Id.,* at 203.

The Court of Appeals considered it more important, however, that the OEO, by withholding funding, had required the selection of a new chairman of the Warren-Trumbull board to reorganize the agency; the Court of Appeals concluded that that was not the kind of authority usually reserved in a principal dealing with an independent contractor. This authority, along with the "voluminous regulations of OEO," the need to secure OEO approval for local programs, and the fact that Congress could have acted directly through the OEO at the local level rather than utilize community action agencies, led the Court of Appeals to hold that community action

agencies are not traditional independent contractors. *Id.*, at 204. The Court of Appeals reasoned that since both the Federal Tort Claims Act and the Economic Opportunity Act were designed to remedy hardship and suffering, they, when read together, indicate that Congress did not intend that beneficiaries of the Economic Opportunity Act who sustain injury in the course of federally approved programs be barred from recovery under the Federal Tort Claims Act. Under that court's holding such "beneficiaries" are in effect carved out as a special class to be covered by the Tort Claims Act independently of whether a member of the public injured by the same car could recover.

Subsequently, in April 1975 the Court of Appeals for the Eighth Circuit reached a contrary conclusion. *Vincent* v. *United States*, 513 F. 2d 1296. We granted the writ of certiorari in this case to resolve the conflict between the Circuits. 423 U. S. 911 (1975).

## II

The Federal Tort Claims Act is a limited waiver of sovereign immunity, making the Federal Government liable to the same extent as a private party for certain torts of federal employees acting within the scope of their employment. The Tort Claims Act was never intended, and has not been construed by this Court, to reach employees or agents of all federally funded programs that confer benefits on people. The language of 28 U. S. C. § 1346 (b) is unambiguous, covering injuries "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment . . . ." [2] The Act defines Govern-

---

[2] Title 28 U. S. C. § 1346 (b) provides in full:

"(b) Subject to the provisions of chapter 171 of this title, the district courts, together with the United States District Court for

ment employees to include officers and employees of "any federal agency" but excludes "any contractor with the United States." 28 U. S. C. § 2671.[3] Since the United States can be sued only to the extent that it has waived its immunity, due regard must be given to the exceptions, including the independent contractor exception, to such waiver. See *Dalehite* v. *United States,* 346 U. S. 15, 30–31 (1953). A critical element in distinguishing an agency from a contractor is the power of the Federal Government "to control the detailed physical performance of the contractor." *Logue* v. *United States,* 412 U. S. 521, 528 (1973).

In *Logue* this Court held that employees of a county jail that housed federal prisoners pursuant to a contract with the Federal Bureau of Prisons were not federal em-

---

the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

[3] Title 28 U. S. C. § 2671 provides in full:

"As used in this chapter and sections 1346 (b) and 2401 (b) of this title, the term 'Federal agency' includes the executive departments, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States, but does not include any contractor with the United States.

" 'Employee of the government' includes officers or employees of any federal agency, members of the military or naval forces of the United States, and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation.

" 'Acting within the scope of his office or employment,' in the case of a member of the military or naval forces of the United States, means acting in line of duty."

ployees or employees of a federal agency; thus, the United States was not liable for their torts. Although the contract required the county jail to comply with Bureau of Prisons' rules and regulations prescribing standards of treatment, and although the United States reserved rights of inspection to enter the jail to determine its compliance with the contract, the contract did not authorize the United States to physically supervise the jail's employees. In short it could take action to compel compliance with federal standards, but it did not supervise operations. In *Maryland* v. *United States*, 381 U. S. 41 (1965), this Court held that civilian caretakers of Air National Guard aircraft assigned to the National Guard, but owned by the United States, were state, not federal, employees although the caretakers were paid from federal funds and required to comply with federal standards. In *Logue* we noted that one of the factors which the Court in *Maryland* v. *United States* relied upon was the state supervision of the relevant military and civilian personnel. Thus, as in *Logue* and *Maryland*, the question here is not whether the community action agency receives federal money and must comply with federal standards and regulations, but whether its day-to-day operations are supervised by the Federal Government.[4]

Billions of dollars of federal money are spent each year on projects performed by people and institutions which contract with the Government. These contractors act for and are paid by the United States. They are responsible to the United States for compliance with the

---

[4] Ohio law .applies the same test in distinguishing between an employee and an independent contractor. See, *e. g.*, *Gillum* v. *Industrial Comm'n*, 141 Ohio St. 373, 381, 48 N. E. 2d 234, 237 (1943); *New York, C. & St. L. R. Co.* v. *Heffner Constr. Co.*, 9 Ohio App. 2d 174, 223 N. E. 2d 649 (1967). See generally Restatement (Second) of Agency § 2 (1958).

specifications of a contract or grant, but they are largely free to select the means of its implementation.[5] Perhaps part of the cost to the Government often includes the expense for public liability insurance, but that is a matter of either contract or choice. The respondents did not sue the community action agency itself. Similarly, by contract, the Government may fix specific and precise conditions to implement federal objectives. Although such regulations are aimed at assuring compliance with goals, the regulations do not convert the acts of entrepreneurs—or of state governmental bodies—into federal governmental acts.[6] Cf. *Jackson* v. *Metropolitan Edison Co.,* 419 U. S. 345 (1974); *Moose Lodge No. 107* v. *Irvis,* 407 U. S. 163 (1972).

Federal funding reaches myriad areas of activity of local and state governments and activities in the private sector as well. It is inconceivable that Congress intended to have waiver of sovereign immunity follow congressional largesse and cover countless unidentifiable classes of "beneficiaries." The Federal Government in no sense controls "the detailed physical performance" of all the programs and projects it finances by gifts, grants, contracts, or loans. *Logue* v. *United States, supra,* at 528. The underlying statute emphasizes that a community action agency is a local, not a federal, enterprise; thus agents and employees of a local community action agency are not "employee[s] of the [Federal] government." 28 U. S. C. § 2671.

---

[5] Since the issue in this case is whether or not there was day-to-day control of a program, it is irrelevant whether the program is funded by means of a contract or a grant.

[6] The Court of Appeals placed reliance upon the suspension of federal funding pending changes in the local board; plainly the granting of funds can be conditional without changing the basic relationship between federal and local governments and their components.

This conclusion is supported by the relevant legislative reports relating to community action programs which reflect the congressional intent and purpose that "the role of the Federal Government will be to give counsel and help, *when requested*, and to make available substantial assistance in meeting the costs of those programs." H. R. Rep. No. 1458, 88th Cong., 2d Sess., 10 (1964) (emphasis in original). Other language similarly reflects that Congress intended not to create new federal agencies but rather "the strengthening of community capabilities for planning and coordinating Federal, State, and other assistance related to the elimination of poverty . . . through . . . local . . . organizations . . . ." 42 U. S. C. § 2781 (a)(1). See S. Rep. No. 1218, 88th Cong., 2d Sess., 18 (1964). Congress also aimed to promote local resident participation in "the development and implementation of all programs and projects designed to serve the poor or low-income areas," 42 U. S. C. § 2781 (a)(4), and to broaden private support and aid, § 2781 (a)(5). Tied in with the latter goal is the requirement that a community action agency receive at least 20% of its support from nonfederal sources. § 2812 (c).

Further support for our conclusion that a community action agency is not a federal agency is the fact that the Economic Opportunity Act provides that a community action agency is to be administered by a *community* action board composed of *local* officials, representatives of the poor and members of business, labor, and other groups in the community, 42 U. S. C. § 2791; no employee of the OEO can serve on the board. 45 CFR § 1015.735–19 (1974). Of course since the community action agencies receive federal funding, they must comply with extensive regulations which include employment policies and procedures, lobbying limitations, accounting and inspection procedures, expenditure limita-

tions, and programmatic limitations and application procedures. 45 CFR pts. 1060–1070 (1974). The OEO also issues numerous guidelines. These regulations and guidelines attempt to assure that the federal money is spent for the benefit of the poor. The regulations do not give the OEO power to supervise the daily operation of a community action agency or a neighborhood program.

Nothing could be plainer than the congressional intent that the local entities here in question have complete control over operations of their own programs with the Federal Government supplying financial aid, advice, and oversight only to assure that federal funds not be diverted to unauthorized purposes.[7] Until now every United States District Court confronted with the issue has so read the Economic Opportunity Act; no District Court has read the Economic Opportunity Act or the Federal Tort Claims Act to mean that whenever a benefit is conferred by Congress, liability for injury to those benefited in the execution of a program or project falls on the Federal Government. *Vincent* v. *United States,* 383 F. Supp. 471 (ED Ark. 1974), aff'd, 513 F. 2d 1296 (CA8 1975); *Orleans* v. *United States,* No. C72–260–Y (ND Ohio Sept. 13, 1973), rev'd, 509 F. 2d 197 (CA6 1975) (case below); *Hughes* v. *United States,* 383 F. Supp. 1071 (SD Iowa 1973); *Anderson* v. *Simpson,* Nos. CA62–18 and 63–58 (ED Tenn., Oct. 17, 1972); cf. *Prater* v. *United States,* 357 F. Supp. 1044 (ND Tex. 1973).[8] To convert the local executors of a locally planned program or project which receives conditional federal funding into federal

---

[7] It is thus irrelevant that the Warren-Trumbull Council did not obtain additional funds from other sources or conduct any programs without federal money.

[8] In another context a community action agency has been held to be a private, not a federal, employer. *Hines* v. *Cenla Community Action Comm., Inc.,* 474 F. 2d 1052, 1058 (CA5 1973).

employees distorts well-established concepts of master and servant relationships and extends the meaning of the Federal Tort Claims Act beyond the intent of Congress.

We therefore hold that the Warren-Trumbull Council for Economic Opportunity and the Westlawn Neighborhood Opportunity Center are not federal agencies or instrumentalities, nor are their employees federal employees within the meaning of the Federal Tort Claims Act, and the judgment before us is accordingly

*Reversed.*